Case 30.;                        Meekin *vs.* Thomas.

ORD. PET.                  APPEAL FROM FULTON CIRCUIT.

1. If the hirer of a slave, to work on a steamboat, navigating the
   Ohio and Mississippi rivers, make no special contract with the per-
   son hiring, imposing restrictions as to the points at which the boat
   may land with the slave, it will be presumed that the boat will
   land wherever interest or duty may require, and there will be no
   liability, if upon the boat landing on free territory, the slave es-
   cape, unless the person hiring fails to exercise that care and dili-
   gence which a prudent man would exercise in respect to his own
   slave.

2. If one hiring a slave should practice any deceit upon the owner by
   inducing a belief that he would only land at particular points, and
   should violate such understanding, he might be responsible in case
   of escape of the slave—*argu.*

[The facts of the case are stated in the opinion of
the court.—REP.]

*James Harlan* for appellant—

There are several grounds for which the judgment
should be reversed, some of which I will proceed to
state:

1. During the progress of the trial the defendant
offered to read the deposition of J. H. Faucett, "and
on motion of plaintiff's counsel, the same was sup-
pressed by the court, to which the defendant, by his
counsel, objected, but his objections were overrul-
ed."

No reason is assigned for suppressing the deposi-
tion. No exceptions were filed to it before the
swearing of the jury as was then and now the prac-
tice. It was not suggested, it was taken upon in-
sufficient notice, or upon no notice. It seems to
have been suppressed because the plaintiff desired
it.

I contend that an order suppressing a deposition
without assigning some cause, and that shown by

the mover to be a valid cause, is an error, of itself, sufficient to reverse the judgment.

2. As to the instructions given by the court below at the instance of the plaintiff.

I contend these instructions are misleading and erroneous, and were prejudicial to the defendant.

The first instruction given for the plaintiff, (marked No. 3,) is to the effect that if plaintiff hired to defendant his slave as a hand on the "Empire," which was plying between New Orleans and Louisville, and such was her custom known generally in the country, and that without any special contract or notification to plaintiff or his agent at the time of receiving said negro slave; that said steamer was to go to Cincinnati, and defendant did run said boat to Cincinnati, and carried said slave as a hand on the boat, and whilst lying in that port said slave "*escaped from said boat, and has not been returned to plaintiff; the law is for him, and the jury must so find.*"

1. The first objection I have to this instruction is, the plaintiff does not alledge in his declaration that the negro man, Lewis, was a *slave.* He may have been a *negro* and not a slave. All *negroes* are not *slaves.*

2. But if it should be determined that Lewis was a slave, the plaintiff failed to alledge he had any property in him. He may have been the slave of some other person, and if so, plaintiff was not entitled to recover his value. Plaintiff may have had a special right to Lewis' services for a term of years, or the life of some person. He (Lewis) may have been held by the plaintiff as dower of his wife in the estate of her first husband; and thus holding him he had no right to recover the full value of Lewis as a slave for life.

3. By the language of the instruction, Meekin is made responsible, let him have been as careful and as vigilant as he might. The mere fact of the boat going to Cincinnati made the defendant an insurer of the safe return of the slave. No allusion is made

to *negligence*. The declaration sought a recovery upon the ground of negligence. but the circuit court wholly disregards the law regulating hiring, and the responsibilities of the hirer.

4. The instruction is objectionable in this, that after informing the jury that if they found certain facts the law was for the plaintiff, and the jury must so find—that is, the jury are to find the full value of the negro without making any deduction whatever for the chances of recapture. It did not follow as a conclusion of *law* from the fact the negro escaped from the boat he might never be had. The chances of recapture should have been left to the jury. The value of the slave, according to the evidence of the plaintiff, was from $800 to $1,000. The jury found $900 which they regarded as his full value.

The other two instructions are less objectionable, but neither presented the law of the case.

3. Defendant moved two instructions, both of which were refused by the court. I contend that these instructions should have been given.

The first is to the effect that the owner of a slave when he hires him on a steamboat should inform the officers of the boat, at the time of the hiring, that the slave was not to be taken to a state where slavery does not exist, and that unless plaintiff gave such notice, or made an express agreement to that effect, the defendant was not responsible for the escape of the slave, unless the jury find there was a want of reasonable care on the part of the defendant.

The second instruction is, "that whenever a port, within a free state, is within the legitimate business of a boat, having hired slaves on board, the hazards of the escapeing of the slave are taken by the owner, unless there is negligence on the part of the officers of the boat; and that if the jury believe, from the evidence, that the steamboat Empire was in the pursuit of her legitimate business when plaintiff's slave escaped in Cincinnati, and that the officers of the boat used the usual care, having hired slaves on

board at a port in a free state, then the law is for the defendant, unless the jury believe there was an express agreement with the plaintiff that the boat should not run to Cincinnati with his slave aboard."

The evidence shows that Captain Meekin was vigilent in preventing an escape, and after it had occurred used great pains, and spent $140 in endeavoring to recapture the boy.

Captain Silas F. Miller had an experience of thirteen years in steamboating; has known the Empire ever since she came out, and she has always been accustomed to go wherever the Captain thought most profitable. Witness says, "where slaves are hired on steamboats it is always the usage for the owners to be at the risk of the slaves escaping or being injured. I have never known any instance to the contrary, and I have been much on boats that had slaves hired on them, and have been much in the habit of hiring them myself; and it is always understood that the hirer pays greater wages for slaves in consequence of the owner running that risk." He says it is not the custom for boats hiring slaves on board to iron or confine them when they enter a *free port*. If that should become common, the practice of hiring slaves on steamboats would be at an end.

Without further quotations from the evidence, it may be assumed that plaintiff failed to make a case that authorized any judgment in his favor.

The proof did not fit the allegations of the declaration, but if it had, plaintiff was not entitled to any judgment, unless he had established negligence on the part of Meekin, which the court below entirely excluded from the jury.

*Turner & Payne* for appellee—

1. The rejection of Faucett's deposition was proper. he was interested, and the proof shows it.

2 Verdict is fully sustained by the proof. The issue was upon the plea of not guilty, and the facts were to be decided by the jury. And it was author-

ized to decide that the boy slave was hired to run on the river between Louisville and New Orleans, where there would be but little danger of escape. The agent who hired the negro to Meekin was authorized to believe, and doubtless did believe, that Louisville and New Orleans were the extreme points to which the boat ran.

3. The law of the case was correctly given to the jury. The evidence shows gross negligence on the part of appellant, by which the slave was enabled to make his escape. The appellant, as bailee, was bound to ordinary care in preventing the escape of the slave. (7 *B. Monroe*, 663.) He knew, moreover, that Cincinnati was a dangerous place for slaves to be taken, and there were many people there who would aid slaves to escape. After the escape there was no proper effort made to recapture the slave. Upon the whole case we think a new trial should not be given against the opinion of the circuit judge who tried the case.

January 26.

Chief Justice CRENSHAW delivered the opinion of the court:

This is an action upon the case, instituted in the Fulton circuit on the 19th day of February, 1851, which was before the adoption of our Code of Practice. The suit was brought by Thomas against Meekin, who was the captain and commander of the steamboat Empire, to recover the value of a negro boy, Lewis, hired to Meekin as a fireman, who made his escape from the steamer into the state of Ohio, whilst she was lying at the wharf at Cincinnati.

The declaration avers that the boy was hired to to operate as fireman on the steamer, on her trips from the ports of Kentucky to the port of New Orleans, and that the boy was received on board for no other or different purpose, that the steamer was advertised and held out, as a regular boat between the ports of Louisville and New Orleans, and that, by the contract of hiring, the negro was to be kept

safely on the boat, that defendant, not regarding his duty, afterwards ran said steamer into the port at Cincinnati, and kept him so negligently and improperly, that he escaped from the boat into the state of Ohio, which is a free state, and was thereby wholly lost to the plaintiff.

Prior to to the hiring, the plaintiff, Thomas, had left the boy with W. E. Sublett, a wharf-boat master at Columbus, in Hickman county, to be hired as a fireman on a steamboat—not to be hired on any particular steamboat—but simply to be hired on a steamboat as a fireman. No directions, whatever, were given to Sublett, except to hire the boy as fireman on a steamer. Not long after the boy was left with Sublett, the Empire hove in sight on her trip up the river from New Orleans. She was hailed from the wharf-boat, and was told by Sublett that he had a hand for the steamer, she then came up to the wharf-boat, and barely touched, the captain saying that the steam was too high to stop, the boy was received on board upon hire as a fireman, and the steamer immediately heaved ahead. No directions were given, and no inquiries were made, as to the points at which the boat was, or was not, to land with the boy, and no restrictions, whatever, were placed upon the defendant, the commander of the boat, as to any particular ports to which the boy should not be carried.

The proof is, that the crew was composed of negroes, and that the sign-board of the boat pointed out Louisville as her place of destination at the time the boy was hired and taken on board. It also appears from the testimony of the plaintiff, that the Empire was a Louisville and New Orleans boat, and that her customary trade was at, and between, those points, and that this was generally known in the vicinity of the hiring.

The testimony on the part of the defendant is, that the Empire did not operate exclusively at Louisville and New Orleans and intermediate points, but

has always run and operated wherever the commander thought the best and most profitable trips could be made, stopping at all the points between New Orleans and Cincinnati, and New Orleans and St. Louis, landing in free, as well, slave states.

Upon this state of case, the principal question is, whether by the simple fact of navigating his boat to the wharf at Cincinnati, in the free state of Ohio, the defendant violated his duty, and incurred the responsibility of answering in damages for the loss or escape of the boy. The circuit court assumed in its instruction, No. 3, given to the jury at the instance of the plaintiff, that this fact, alone, rendered the defendant responsible for the escape of the boy, whatever may have been the care and diligence observed to prevent his escape. We think this instruction clearly erroneous. It is in the following language:

"The court instruct the jury that if they believe from the evidence that plaintiff hired to defendant his slave, as a hand on the steamer Empire, and that she was plying between the ports of New Orleans and Louisville, and such was her custom, known generally in the country, and that, without any special contract or notification to the plaintiff or his agent, at the time of receiving said negro slave, that said steamer was to go to Cincinnati, and carried said slave as a hand on said boat, and that, whilst lying at the port of Cincinnati, said slave escaped from said boat, and has not been returned to plaintiff, the law is for him, and the jury must so find."

Now, although the Empire may have usually plyed between Louisville and New Orleans, yet it is shown that she went occasionally to Madison in Indiana, and Cincinnati, Ohio, and St. Louis, Missouri; and it is known to be the profession and business of steam boats navigating the Mississippi and Ohio rivers, to visit and land at points, whether on slave, or free territory, where the best prospects may offer

themselves for the interest and emolument of the owners. To this effect is the proof in this cause in regard to the Empire, and, although it may have been her custom to ply between the ports of Louisville and New Orleans, it must be assumed to have been expected and known to the plaintiff and his agent, Sublett, and others, that the object of steamers was to operate for the interest and pecuniary advantage of their proprietors, and that whatever may have been their customary routes, these routes were changed as business and profit required. Such was the practice, according to the proof, of the Empire, she went where business invited, and where her prospects were brightest. In doing so, she was pursuing her legitimate business, and cannot be held accountable for the escape of hired slaves on board, whilst thus lawfully engaged, simply because she made a voyage to Cincinnati, and landed upon free soil. It may be, and we believe it is true, that it is more hazardous to land with slaves at Cincinnati, than at other points in free territory on the Ohio river. Still the Empire did not go beyond her legitimate sphere, in making a voyage to that port, in the pursuit of her business and profession, and cannot be held responsible for doing so.

The owners of slaves who hire them to steamboats must be presumed to know their habit and custom and business and profession, and to risk the hazards of the service to their slaves, and to make their contracts of hiring in contemplation of all the risks incident to the service, unless it be stipulated to the contrary.

The Empire, whilst plying between Louisville and New Orleans, must have been in the constant habit of landing at the intermediate points, New Albany, Evansville and Cairo, in the free states of Indiana and Illinois, and this was certainly known or believed by the plaintiff, and his agent, Sublett, and must have been expected to continue, and yet no restriction was placed upon the defendant in regard to

1. If the hirer of a slave to work on a steam boat navigating the Ohio and Mississippi rivers, make no special contract with the person hiring, imposing restrictions as to the points at which the boat may land with the slave, it will be presumed that the boat will land wherever interest or duty may require, and there will be no liability, if, upon the boat landing on free territory, the slave escape, unless the person hiring failed to exercise that care and diligence which a prudent man would exercise in respect to his own slave.

landing at those places, and no requisition made that the boat should cease to land at those points, or should not visit other places in free States.

But, it may be said that as, at the time of hiring, the sign-board of the Empire indicated Louisville as her place of destination, the plaintiff, or his agent, Sublett, might have been deceived by this index, and, therefore, that the defendant should be held to have violated his duty in going beyond Louisville to Cincinnati, and be made accountable on this ground for the escape of the slave. This index, however, was not hung out to the owners of slaves who might wish to hire them, nor for the purpose of obtaining hands to operate on the boat, but was hung out for freight and passengers, and might have been taken down at any time, and the purpose and object of this sign-board being generally known, must be presumed to have been within the knowledge of plaintiff's agent, and he could not well have been deceived thereby, and had no right to rely on it as an evidence that the boat was going no further than to Louisville. Such an index was a token that the Empire was bound for Louisville, but is not sufficient evidence that she would go no further. She may not, at the time, have intended to prosecute her voyage beyond Louisville, and yet, upon reaching that point, have found it to her interest to visit Cincinnati in pursuit of business. This was natural and to be expected, and must be taken to have been in the contemplation of the hirer, in the absence of any restrictive stipulation.

2. If one hiring a slave should practice any deceit upon the owner, by inducing a belief that he would only land at particular points, and should violate such understanding, he might be responsible

The result is, that if the hirer of a slave, to operate on a steamboat, make no special contract to the contrary, and impose no restriction upon him to whom the slave is hired, as to routes and places of landing, the latter must be considered at liberty to go to any point or place on the rivers then being navigated by him, where the appropriate business of his boat may call him. Whether he would have a right to deviate so far from the accustomed route of his business as to leave the waters usually navigat-

MEEKIN
vs.
THOMAS.

in case of es-
cape of the
slave—*argu.*

ed by him, and penetrate rivers running into the interior of free states, and prosecute his business of steamboating thereon, with hired slaves on board, and not be responsible for their escape, though no express restriction was placed upon him, is a question which does not arise and need not be decided. It certainly must be taken to have been in the contemplation of the owner of the slave, and of his agent, Sublett, that the Empire would, as its business might require, visit and stop at points on the Ohio river, as far, at least, as this river is common boundary to Kentucky, Illinois, Indiana, and Ohio. And the defendant must be regarded as having the privilege of doing so, in the absence of any stipulation to the contrary. The responsibility of the defendant, therefore, must not rest upon the fact that he visited Cincinnati with his boat with the slave on board, but it must be tested by the rules of law applicable to him simply as bailee of the slave. If, when he arrived at Cincinnati, he exercised due and proper diligence to prevent the escape of the slave he is not responsible, if he failed to do this, he is responsible.

Instructions, Nos. 4 and 5, appear upon their face to have been given at the instance of the defendant, yet the record states that they were given at the instance of the plaintiff. These instructions are only slightly objectionable, and do not differ materially from each other. They tell the jury, substantially, that, if they believe it was the *custom* of the Empire to ply between New Orleans and Cincinnati, or other ports where business was most profitable, and that the slave was put on board as a hand, and the boat was run to Cincinnati with the slave on board, and that the captain and officers took reasonable and proper care of the slave under the circumstance, and used due and proper diligence to reclaim him, the law was for the defendant, unless there was an understanding, or express contract, that the slave was not to be taken to Cincinnati.

If these instructions were asked by the defendant, (and we suppose they were, notwithstanding the record as it stands, is to the contrary) they are not as favorable to him as they might have been. We have seen that, whether it was the *custom* of the Empire, to go to Cincinnati or not, she had the right to go there with the slave, in the absence of an agreement or understanding that she was not to do so, and it is certain that there was no understanding or agreement between the parties that she was not to take the boy to Cincinnati.

Instruction No. 1, asked by defendant and refused by the court, when so shaped as to apply to the facts of this case, would be unobjectionable. As it stands, it would, in principle, exonerate from responsibility the bailee of a slave to be employed on a steamboat, in the absence of any restriction upon him, although he might divert the the boat from the waters in which she is then running, to the rivers penetrating the interior of the free states, which presents a question which we do not decide, because it does not arise, and because we are not prepared to say that such a diversion might not be a deviation not to be regarded as in the contemplation and expectation of the owner of the slave, and for which the bailee ought to be held responsible. It will be time enough to decide that question when directly presented.

Instruction No 2, also asked by the defendant, and refused by the court, contains, substantially, the same principle, but in terms less acceptable and appropriate.

The sum of the foregoing views is, that the Empire, in going to Cincinnati. did not go to a point beyond what, in reason, the owner of the slave, or his agent, might and ought to have expected her to go, if her business, in the estimation of her commander, required it, and that he cannot be held responsible for the escape, at that point, in the absence of a stipulation or agreement that he was not to go there, unless the escape was in consequence of a failure to

observe ordinary care and prudence, and by the terms "ordinary care and prudence," we mean, of course, such as a man of ordinary care and prudence would have exercised, in view of the hazards incident to slave property at the port of Cincinnati, had the slave been his own. Whether the care, caution and prudence, which the circumstances demanded, was observed or not, it is the province of a jury to determine, and we forbear to make any remarks upon that subject.

It may not be superfluous to add, that if the bailee of a slave to be employed on a steamboat should, in contracting to hire him, deceive the owner or his agent, by inducing him to believe that his boat was to be navigated only between particular points, and should afterwards transcend those limits, and the slave should escape he might justly be held accountable, even in the absence of a stipulation or agreement that the boat should be employed only within those points. If the confidence of the owner of the slave should thus be betrayed, it would be a fraud upon him, for which the bailee should account. Nothing of the kind, however, occurred in this case. It is in proof that Faucett was interested in the boat and he was on board when the slave escaped, and the presumption is that he would have to share any responsibility which may be imposed upon the defendant for the slave's escape, and we think that his deposition was not improperly excluded.

Judgment reversed and the cause remanded for a new trial and further proceedings consistent with the principles of this opinion.